**Commonwealth v. Spencer**

*Jay W. Hannon,* for Commonwealth.
*Patrick Connors,* for defendant.

JENKINS, *J.*, January 20, 2011—After a non-jury trial, the court found defendant guilty of two counts each of theft of services, commercial bribery and theft by deception. The court sentenced defendant to 15-30 months imprisonment for one count of theft of services and concurrent terms of 9-18 months imprisonment for all other counts of conviction. Defendant's lone argument in this timely direct appeal is that the evidence was insufficient to support his convictions for commercial bribery. The court rejects this argument and recommends that defendant's judgment of sentence be affirmed.

Even if defendant prevailed on this issue, he is not

entitled to relief. His aggregate sentence will remain the same due to his failure to challenge his four theft convictions.

## I. Factual History

Defendant is an employee of Contract Callers Incorporated ("CCI"), an entity PECO hired to shut off electricity of customers for non-payment of electric bills. N.T., 8/10/10 ("Tr. I")[1], p. 45; Tr. III, p. 21. Defendant and a co-employee, Nelson Westcott, were a two-man field team called "Bucket No. 2" which performed service terminations. Tr. II, pp. 6, 9.

On March 4, 2010, CCI gave bucket no. 2 a work order to turn off the electricity of Aston Sign Company ("ASC") in Middletown Township. Tr. I, pp. 17-18; Tr. II, pp. 11-13; Tr. III, pp. 23-24. The field team told ASC's owner, Joseph Kvech, that they were PECO employees who were turning off ASC's power, and they showed Kvech bills identifying the amount in arrears as about $329. Tr. I, pp. 19, 21.

Defendant dismantled the electric meter and turned off the power. Tr. I, pp. 23-24. Kvech asked whether he could pay the arrears at that time, and defendant replied that he could not accept a check or credit card. Tr. I, p. 23. Kvech gave defendant $330 in cash and told him he could keep the change. Tr. I, p. 23. Defendant accepted the payment, turned the electricity back on, and left the property with the other CCI employee. Tr. I, p. 24. Later that day, defendant

---

1. "Tr. I", "Tr. II" and "Tr. III" will refer to testimony taken on August 10, 2010, August 11, 2010, and August 12, 2010, respectively.

returned a work order to CCI indicating that bucket no. 2 had terminated electric service at ASC. Tr. II, pp. 16-17. Bucket no. 2 did not turn over any cash received at ASC. Tr. II, p. 18.

PECO prohibits field technicians such as defendant from accepting cash payments. Tr. I, pp. 45-46; Tr. II, pp. 17, 34, 43. Commercial customers can pay field technicians by check; residential customers must pay PECO directly by check or credit card. Tr. I, pp. 45-46; Tr. II, pp. 17, 34, 43.

Kvech asked his daughter, who paid ASC's bills, about the unpaid bill, and she admitted that she forgot to pay it. Tr. I, p. 25. But when she checked online the next few days, she found that Kvech's cash payment had not been credited to his account. Tr. I, pp. 25-26. Kvech contacted PECO to report that he had not received credit for his payment, and that the power was on even though the meter was not running. Tr. I, pp. 26-27. According to PECO records, power should not have been on at that time. Tr. I, p. 48. The commonwealth presented expert testimony that somebody had altered the meter with a screwdriver; the alterations were not the result of meter malfunction. Tr. II, pp. 67-68.

Five days after the incident at ASC, CCI gave defendant a work order to shut off electricity at Keith Greiman's residence in Philadelphia. Tr. II, p. 19. Defendant presented Greiman with a non-payment shutoff notice but added that his power would remain on if he paid a $70 reinstatement

fee. Tr. III, pp. 4-5. Greiman offered a personal check, but defendant stated that he could only accept cash. Tr. III, pp. 4-5. Greiman gave defendant cash. Defendant entered the house and proceeded to the meter in the basement, conduct Greiman found strange since he had already paid defendant the requested cash. Tr. III, p. 7.

When defendant left, Greiman called PECO, which informed him that what had transpired was not standard PECO operating procedure, since PECO did not accept on-site payment from residential customers. Tr. III, pp. 7-9. Defendant, on the other hand, reported to CCI that he went to Greiman's residence alone, but that the resident denied him access to the interior meter. Tr. II, pp. 21-22. There was no mention in defendant's report that he accepted money from Greiman.

## II. Discussion

When the defendant objects to the sufficiency of the evidence, our appellate courts must view all the evidence and all reasonable inferences therefrom in the light most favorable to the commonwealth, the verdict winner. *Commonwealth v. Widmer*, 560 Pa. 308, 318, 744 A.2d 745, 751 (2000). The evidence is sufficient to sustain the conviction when it establishes each material element of the crime charged against the defendant beyond a reasonable doubt. *Id.* An appellate court "may not weigh the evidence and substitute [its] judgment for the fact-finder." *Commonwealth v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995). The commonwealth may satisfy its

burden of proving every element of the crime beyond a reasonable doubt with wholly circumstantial evidence. *Commonwealth v. Cunningham*, 805 A.2d 566, 571 (Pa. Super. 2002), alloc. denied, 573 Pa. 663, 820 A.2d 703 (2003). The facts and circumstances established by the commonwealth need not preclude every possibility of innocence. *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Id.*

Pennsylvania's commercial bribery statute prescribes:

An employee, agent or fiduciary commits a misdemeanor of the second degree when, *without the consent of his employer* or principal, he solicits, *accepts*, or agrees to accept any *benefit from another person upon agreement or understanding that such benefit will influence his conduct in relation to the affairs of his employer* or principal. 18 Pa.C.S. § 4108(a) (emphasis added).

This language is quite broad. It requires that an employee solicit or accept a benefit from another in order to influence the employee's conduct in relation to his employer's affairs. The statute contains no requirement that the affected conduct be in relation to the official duties of an agent or employee, nor does it require a showing that an offender's conduct was adverse to the

interests of the employer. *United States v. Parise*, 159 F.3d 790, 799 (3rd Cir. 1998).

The leading case on this statute is *Commonwealth v. Bellis*, 484 Pa. 486, 399 A.2d 397 (1979), which affirmed a city councilman's conviction for commercial bribery under the predecessor statute to § 4108. The councilman had represented private parties before city agencies to help these companies secure contracts with these agencies. The companies rewarded his efforts accordingly. The Supreme Court conceded that the councilman's acceptance of money "did not affect the performance of his official duties as a city councilman," and that "he did not take any action in City Council on behalf of private parties." *Id.*, 399 A.2d at 400. Nevertheless, it was "irrelevant" to the commercial bribery inquiry whether a particular activity was among an employee's "official duties." *Id.* A bribe need not have any impact on an employee's official duties to comprise "conduct in relation to the affairs of his employer." *Id.* The commercial bribery statute requires an employee's "undivided loyalty" to his employer, and it is "impossible for an [employee] to retain this loyalty" if he "receives money from third parties in return for acting on their behalf...in his [employer's] affairs." *Id.*

Based on *Bellis*, the Third Circuit held that § 4108 does not require analysis of whether the employee's conduct helps or harms the employer. *United States v. Parise*, 159 F.3d 790, 800 (3d Cir. 1998). Parise cited with approval *United States v. Johns*, 742 F. Supp. 196, 220 (E.D.Pa.

1990), which found the defendant guilty under § 4108 even though the price and quality of the products obtained from the favored vendor were "more favorable" than any offered by competitors. *Id.*

Here, without CCI's and PECO's consent — indeed, in direct violation of CCI's and PECO's regulations — defendant accepted cash payments from ASC and Greiman in return for keeping their power on. Defendant did not give the money to CCI or PECO. In ASC's case, defendant tampered with the meter to deceive CCI and PECO into believing that the power was off.[2] This evidence shows, in the words of § 4108, that defendant "accept[ed]...benefit[s] from other person[s] upon agreement or understanding that such benefit[s] [would] influence his conduct in relation to the affairs of his employer." *Id.* And in *Bellis'* words, defendant disregarded his duty of loyalty toward CCI and PECO by "receiv[ing] money from third parties in return for acting on their behalf...in his [employer's] affairs." *Id.*, 399 A.2d at 400. Finally, while proof of harm to CCI or PECO was not necessary, *Id.*, the evidence clearly demonstrated injury: defendant pocketed money owed to PECO, and two customers continued to receive power after it should been shut off.

The evidence was sufficient to satisfy all elements of commercial bribery. The court therefore recommends that defendant's judgment of sentence be affirmed.

---

2. The commonwealth did not present any expert testimony that defendant fiddled with Greiman's meter.